Franklin M. Phillips *et als. v.* W. J. Rawlins and William Fetters.

## SUPREME COURT—IN ADMIRALTY.

### Franklin M. Phillips et als. *vs.* W. J. Rawlins and William Fetters.

ALTHOUGH the general rule of law is, that merely gratuitous services afford no consideration upon which to raise an implied promise of payment, an exception is allowed by the maritime law in cases of salvage service, on account of its peculiar character.

The assistance rendered by the libellants, who were part of a shipwrecked crew, to the respondents, on a shoal in the open ocean (outside the limits of any State or Government), in capturing seals ; held to be a maritime service, cognizable in the Admiralty.

By the provisions of the Act of Congress of the United States, relating to the discovery of guano deposits, all acts done or crimes committed on any island, rock or key, upon which such deposits may be found, or in the adjacent waters shall be deemed to have been done on the high seas, on board of a merchant vessel of the United States, thus placing them by statute under the jurisdiction of Admiralty Courts.

The value of the salvage service, rendered by the libellants, awarded upon a consideration of the facts and circumstances of the case.

Judge ROBERTSON, acting as Chief Justice, pronounced judgment as follows :

The libellants in this cause, Phillips and others, twenty in number, claim to recover from the respondents, compensation for labor and services, done and performed for their benefit, in saving property from the wreck of the whale ship " South Seaman ;" and in procuring a quantity of seal oil, at French Frigate Shoal.

It appears, in substance, from the pleadings and the testimony, that the American whaleship " South Seaman," Norton, master, a few days after leaving Honolulu, bound to the northern seas, struck on the weather side of French Frigate Shoal, about six hundred miles from this port, before daybreak on the morning of the 13th March last; that, after daylight, five boats were lowered and got clear of the " South Seaman," in which the master, officers and crew embarked, abandoning the ship, with provisions and water sufficient for eight days ; that, about two hours after leaving the wreck, while steering, as the Cap-

Franklin M. Phillips *et als.* *v.* W. J. Rawlins and William Fetters.

tain said, in the direction of Guam, they descried a strange boat, which proved to belong to the schooner "Kamehameha IV," the respondents' vessel, then lying at anchor near a sand spit, with a guano and sealing party under respondents' command ; that, the people of the "South Seaman," of whom the libellants were a part, followed the schooner's boat to shore, where they were received in the most friendly manner by the respondents and party, who showed them every kindness in their power ; that, two days afterwards, the respondents dispatched their schooner for Honolulu, carrying the master and thirteen of the officers and crew of the wrecked ship ; that, the libellants and seven or eight others, the rest of the crew, remained on the sand spit with respondents' party ; that, before sailing for Honolulu, Captain Norton gave to respondents four of the five boats saved from the "South Seaman," and requested those of her crew, who remained at the place, to render all the assistance they could to the respondents ; that, after the departure of the schooner, those of the "South Seaman's" crew, who were not sick, joined the respondents' party in sealing on the neighboring sand spits and reefs, maning the boats and otherwise materially assisting in capturing a considerable number of seals, sufficient to yield, at least, seventy barrels of oil ; that, on the tenth day after the "South Seaman" struck the reef, and on two subsequent occasions, some of her crew, together with one of the respondents and others of their party, succeeded in boarding the wreck, from which they brought away provisions, clothing, whaling craft, and other articles, which, including the boats spoken of as having been given respondents by Captain Norton, are valued at $1,500, all which property is in respondents' possession; that the libellants were so employed until the return of the schooner from Honolulu, under charter, to bring hither such of the crew of the "South Seaman" as had remained on the sand spit; and that the respondents became the purchasers of the wrecked ship and her materials, which were sold at auction, in Honolulu.

In the course of the argument of the cause, several points were raised in opposition to the claim of the libellants. I shall confine myself to a brief consideration of those points only which I deem essential to a decision.

It is contended, on the part of the respondents, that the labor and service done and performed for their benefit, by the libellants, were, so far as the respondents are concerned, wholly voluntary and gratuitous, and rendered at the request of Captain Norton, in return for the kind treatment extended to the shipwrecked crew by the respondents ; and that the services having been so rendered, raise no implied promise on the respondents' part to pay for them.

So far as regards the salvage service performed by the libellants, the objection here raised has, in my opinion, but little force, because, although the general rule of law is that merely gratuitous services will afford no consideration, upon which to raise an implied promise to pay their worth, an exception to this rule is allowed by the maritime law in cases of salvage service, on account of its peculiar character. (Story on Contracts, sec. 455.) If a real salvage service has been rendered, whether spontaneously or by request, as a general rule, every person who assisted in performing that service is entitled to share in the compensation. (Conkling's U. S. Admiralty, p. 279.) So that, if the libellants united with the respondents and their party, in rendering the salvage service performed in this case, without expressly stipulating that they were to receive no compensation, they are by law entitled, as co-salvors, to share in the reward.

Their claim might be prosecuted either *in rem* or *in personam*, and they have chosen to prosecute it *in personam*, on the ground that the respondents have possession of the salved property.

But I am of the opinion, upon consideration of all the evidence, that the services rendered by the libellants, both in saving property from the wreck of the " South Seaman," and in capturing seals, were done at the request, as well as for the benefit, of the respondents, and cannot, in either case, be looked upon as services of the nature understood in law as merely voluntary and gratuitous, and not implying a promise, on the part of those benefited thereby, to pay what they are reasonably worth. (See Addison on Contracts, p. 213; Story on Contracts, sections 454, 456.)

The respondents object further to the claim of the libellants, on the ground that the assistance rendered by them, in captur-

ing seals on the sand-spit at French Frigate Shoal, is not a maritime service; and therefore, that admitting the libellants are entitled to payment, they have come to the wrong Court to seek for it. In other words, the service is not a maritime service, and the claim to be paid therefor is not cognizable in a Court of Admiralty. This point was argued with much ingenuity by counsel for respondents, and has been carefully reflected on by the Court. My opinion upon the point is briefly this: The *subject matter* of the implied contract upon which the libellants rest their claim for compensation, furnishes the criterion by which the Court must decide the question. Is that subject matter labor and services performed by the libellants, in an employment embraced within the scope of the terms, maritime commerce, or navigation, as understood in maritime law? I am clearly of the opinion that it is. While it is true, as appears by the testimony, that the capturing or killing of the seals, was for the most part effected on land, yet the services rendered by the libellants were mainly performed on the sea, in the manning, navigating, lading and unlading of the boats. And, although the libellants never were attached by contract with the respondents, as mariners, to any particular vessel, or hired for any particular voyage, yet they were employed by the respondents in the prosecution of a branch of business, which is universally recognized as being included in the term, maritime commerce. This is the main consideration. *The nature of the case decides the question of jurisdiction.* And the mere fact that the killing of the seals, and the trying out of the blubber, were done upon dry land, cannot deprive the service rendered by the libellants, of its character as a maritime service, or their contract of its nature as a maritime contract, any more than the fact that the shipwright who builds or repairs a ship upon dry land, can change the nature of his contract or service. (See Benedict's Admiralty, sections 211, 263, 264 and 265; Read *vs.* The hull of a new Brig, 1 Story's Rep., p. 245; De Lovio *vs.* Boit, 2 Gallison's Rep.)

There is weight also in the consideration urged by counsel for the libellants, that any services rendered upon the reefs or spits of French Frigate Shoal, situated as it is in mid-ocean, and not within the limits of any particular State or Government,

may well be regarded as having been rendered upon the high sea. And, although it is admitted that the respondents had taken possession of the Shoal, with the intent of availing themselves of the provisions of the Act of Congress of the United States, relating to the discovery of guano deposits, it will be observed on reference to that Act that, while providing that the islands, rocks and keys, on which such deposits shall be found, may, in the discretion of the President, be considered as appertaining to the United States, yet the Act expressly declares that, all acts done or crimes committed on any such island, rock or key, or in the adjacent waters, shall be deemed to have been done on the high seas, on board of a merchant vessel of the United States; thus placing them, by statute, under the jurisdiction of Admiralty Courts.

For the reasons already stated, I am of the opinion that the libellants have a just claim to a reasonable compensation, both for the services rendered by them as cosalvors with the respondents, and for those services performed for the benefit of the respondents, in and about their sealing enterprise. And it only remains for me now to adjudge how much that compensation ought to be.

In view of the fact that the "South Seaman" had been abandoned by her master and crew, and become derelict, and considering the circumstance that, from the position of the wrecked vessel on the weather shore of the reef, amidst high breakers, the salvage service was rendered somewhat perilous of performance, I think the value of the entire salvage service may fairly be estimated at one-half the agreed value of the property saved, say $750. In ascertaining what proportion of that amount ought to be awarded to the twenty libellants, it should not be forgotten that the success of the effort at saving property is attributable, in a great measure, to the exertions of Mr. Ormsby, the fifth mate of the "South Seaman," who, for reasons which he stated, has waived any claim against the respondents; and that several others of the "South Seaman's" crew assisted in the work. In view of all the facts, I consider the salvage service of the libellants reasonably worth four-tenths of the whole, say $300. It appears by the testimony of Mr. Perry, the mate of the schooner "Kamehameha IVth," that

the services of the libellants, particularly the Hawaiians, who are good boatmen, and of whom there are thirteen joined in the libel, were very valuable to the respondents, in the business of procuring seals. But then it should be borne in mind, that the respondents furnished the greater part of the means and appliances, and the personal intelligence, necessary to the prosecution of the enterprise, as well as the casks in which to put the oil, and a vessel to convey the same to market. I award to the libellants, on this part of their claim, three-tenths of the value of 70 barrels—2,205 gallons—of seal oil, at the agreed price of 37½ cents per gallon; say three-tenths of $826 37, being $248 05; making in all the sum of $548 05.

Decree accordingly, in favor of the libellants, with costs.

Mr. Harris, for libellants.

Mr. Blair for respondents.